IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,
    *Plaintiff,*

    v.                        Civil Action No.: ELH-10-2541

TOWN OF ELKTON,
    *Defendant.*

**MEMORANDUM OPINION**

The Equal Employment Opportunity Commission ("EEOC") has brought suit against the

Town of Elkton, Maryland ("Elkton" or the "Town"), to "correct unlawful employment practices

on the basis of age and to provide appropriate relief to Andrew P. Johnson."  Complaint (ECF 1)

at 1.  The EEOC alleges that on November 21, 2007, defendant terminated Johnson, whose

performance was "at all times excellent," from his dual position as Finance Director and

Assistant Town Administrator, solely because of his age, 70, and replaced him with two

"significantly younger employees," in violation of the Age Discrimination in Employment Act,

29 U.S.C. § 621 *et seq.* (the "ADEA").  *Id*. at 1, ¶ 7.

The EEOC seeks a permanent injunction enjoining the Town, "its officers, successors,

assigns and all persons in active concert or participation with it, from discharging employees on

the basis of age and engaging in any other employment practice which discriminates on the basis

of age against individuals 40 years of age and older."  *Id*. at 3.  It also seeks an Order instructing

Elkton "to institute and carry out policies, practices and programs which provide equal

employment opportunities for individuals 40 years of age and older, and which eradicate the

effects of its past and present unlawful employment practices."  *Id*.  On behalf of Johnson, the

EEOC also seeks back wages, liquidated damages, prejudgment interest, reinstatement and/or

"front pay."  *Id*. at 4.

Elkton has moved for summary judgment ("Motion," ECF 19), pursuant to Rule 56 of the Federal Rules of Civil Procedure, supported by a memorandum ("Memo," ECF 19-1).  Plaintiff opposes the Motion ("Opposition," ECF 21), and Defendant has replied ("Reply," ECF 24).  The parties have also submitted numerous exhibits.  As the matter has been fully briefed, the Court now rules pursuant to Local Rule 105.6, no hearing being necessary.

## Factual Background[1]

Elkton is governed by a Mayor and a Board of four Commissioners, all of whom are popularly elected and work part-time in these positions.  *See* Plaintiff's Exh. 1, Defendant's Exh. 27, Deposition of Lewis[2] George, Jr., Feb. 4, 2011, 17:12-19.[3]  The Mayor is Elkton's Chief Executive Officer ("CEO").  *See id*. at 17:12-14.  Collectively, the Mayor and Commissioners comprise a legislative body that approves or rejects proposed legislation by majority vote.  *See* Plaintiff's Exh. 2, Defendant's Exh. 25, Deposition of Earl Piner, Sr., June 10, 2011, 20:11-21:4.  The Town Administrator is responsible for the Town's day-to-day operations, *see* George Dep., 21:1-7, and supervises the Town's employees.  *See* Piner Dep., 18:15-20; Plaintiff's Exh. 4, Defendant's Exh. 18, Deposition of Joseph Fisona, July 26, 2011, 12:19-21.  Along with the Commissioners, the Town Administrator is empowered to hire and fire municipal employees.  *See* Defendant's Exh. 1, Town of Elkton Charter, § C9-1(C) (empowering the Town

---

[1] The Court construes the facts in the light most favorable to plaintiff as the nonmoving party.  *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *accord Scott v. Harris*, 550 U.S. 372, 380 (2007).

[2] George's first name appears in the record as both "Louis" and "Lewis."  I have used the spelling of "Lewis," which appears on the cover page of George's deposition, unless quoting another spelling.

[3] Both sides have submitted duplicate deposition testimony as exhibits.  After referencing each deposition with the parties' respective exhibit numbers, I refer to the exhibits solely by the name of the particular deponent.

Administrator to "hire, suspend, transfer and discharge Town employees except as otherwise provided by the Board of Commissioners").

Joseph Fisona was the Mayor of Elkton at the time of Johnson's termination. *See* Plaintiff's Exh. 3, Defendant's Exh. 4, Deposition of Andrew Johnson, Mar. 10, 2011, 40:6-7. At that time, Mary Jo Jablonski; Earl Piner, Sr.; C. Gary Storke, and Charles Givens were Elkton's four Commissioners, George Dep., 24:12-15, and Lewis George, Jr. was the Town Administrator. *See id.* at 13:18-20.

Johnson was born in 1937. *See* Johnson Dep., 44:1-2. He began working for Elkton in 1999, at the age of 61, under the supervision of George, the Town Administrator. *See* George Dep., 127:7-11; Johnson Dep., 32:9-12. Initially, plaintiff worked only as Assistant Town Administrator. *See* George Dep., 33:21-34:2. But, in May 1999 Johnson also became the Finance Director. *See* Defendant's Exh. 6, Memorandum of May 24, 1999, to George from Personnel Director Shirley Moll (noting that "Effective May 21, 1999 Mr. Andrew Johnson formally accepted the position of Director, Finance Department. Mr. Johnson will perform duties as treasurer and continue to perform as Assistant Town Administrator."). Johnson assumed the additional responsibilities of Finance Director after it was suspected that his predecessor had embezzled public funds. *See* Johnson Dep., 34:2-35:2. As Finance Director, Johnson developed policies and procedures to prevent the reoccurrence of such events. *See id.* Johnson spent approximately 75% of his time performing his duties as Finance Director, and 25% of his time performing his duties as Assistant Town Administrator. *See id.* at 38:10-13.

From 1982 to 1993, Johnson served as Finance Director for the Town of Smyrna, Delaware. *See* Johnson Dep., 11:20-12:7. Johnson left that position because "there was a move afoot to cut [him] back from finance director to office manager." *Id.* at 14:7-11. He then served

as Town Manager for Middleton, Delaware from 1994 to 1996. *See id.* at 15:9-11; Defendant's Exh. 3, Johnson Resume. Johnson left that position to work for the Town of Rock Hall, Maryland. *See* Johnson Dep., 17:8-19. He served as Rock Hall's Town Administrator from 1996 to 1997. *See* Defendant's Exh. 3, Johnson Resume. He then accepted a position as Town Manager of Chipley, Florida. *See* Johnson Dep., 19:16-20:1. However, he held that position for only one week because, shortly after Johnson and his wife arrived in Florida, they learned that Johnson's father-in-law was terminally ill, and they decided to return to Delaware. *See id.* at 20:4-15; 21:4-6.[4] From the time Johnson returned to Delaware in 1997 until he was hired by Elkton in 1999, Johnson, a licensed realtor, worked "selling real estate." *Id.* at 21:11-14; 22:10-15; Defendant's Exh. 3, Johnson Resume.

Although Johnson has "a hundred credit hours of college-level training" out of the one hundred and twenty credit hours necessary to graduate, and an additional "103 hours…training as a certified municipal clerk," he does not hold an Associate's or Bachelor's degree. Johnson Dep., 7:12-9:5. It was not a job requirement for the director of finance to be a Certified Public Accountant, and Johnson does not possess that credential. *See id.* at Attachment 5, Job Description for Director of Finance. Elkton's July 2007 job description for "Assistant Town Administrator" made no reference to requisite computer skills. *See* Defendant's Exh. 13. Nor did the job description for the position of Finance Director, circulated after Johnson's departure, refer to computer skills. *See* Plaintiff's Exh. 12 at Attachment 1, Director Finance Department Job Description.

Although employees can be denied raises under the Town's compensation system if they

---

[4] Johnson testified that the Mayor and Commissioners of Chipley "wanted to give [him] a leave of absence, but [he] told them that that would not be fair to the town, because [he] had no idea how long [the leave] would be." *Id.* at 20:14-20.

exhibit poor performance, *see* George Dep., 55:7-17, Johnson received every raise for which he

was eligible.  *See id.* at 66:9-14.  Moreover, his yearly performance reviews were all positive.

*See* Plaintiff's Exh. 8, Declaration of Andrew Johnson, ¶ 18.  When Elkton commissioned an

"Employee Feedback Survey" in 2005, one of Johnson's supervisees, whose comment was

anonymous, stated:

> I have no complaints about my department.  Andrew Johnson is a fabulous man to
> work for.  He encourages his department to do their best and praises us for our
> efforts.  I thoroughly enjoy reporting to work.  Our department is a group of
> dedicated people that interact well together.

Plaintiff's Exh. 8D at 24.

Under Johnson's supervision, the finance department won several awards.  *See* Fisona

Dep., 18:15-16.  In particular, in fiscal years 2004, 2005, 2006, and 2007, Elkton won a

"Certificate of Achievement for Excellence in Financial Reporting," a nationally recognized

award for financial reporting issued by the Government Finance Officers Association.  *See*

Johnson Dec., ¶¶ 13, 16.  As a result, Elkton was able to secure better interest rates, saving the

Town thousands of dollars.  *See id.* ¶¶ 14, 17.[5]  Johnson also collected hundreds of thousands of

dollars in delinquent "major facilities funds," and arranged financing for a new waste water

---

[5] In its Memo, Elkton states: "When asked by Plaintiff's counsel whether [Johnson] had
won awards, Commissioner Jablonski noted that the Finance Department (rather than [Johnson])
had won an award, but it was something that was given to the Town each year as a matter of
course."  *Id.* at 18 (citing Plaintiff's Exh. 6, Defendant's Exh. 23, Deposition of Mary Jo
Jablonski, July 26, 2011, 30-31).  In its Opposition, at 17, plaintiff counters, without citation:
"This award is not given as a matter of course."

Jablonski did not testify that the award was received "as a matter of course."  Rather, she
testified that the award was received by Elkton "every year."  The following deposition
testimony of Jablonski is relevant, Jablonski Dep., 31:2-7:

Q. Did Mr. Johnson's work ever win any awards?
A. The Finance Department has.
Q. Do you know what awards were won?
A. We receive it every year.  It is an award for municipal financing—I am sorry, I
    don't know the name of it exactly—given to the Finance Department.

treatment system costing forty million dollars.  *See id.* ¶ 17 (a),(g).   In addition, he developed a program to privatize trash service, *see id.* ¶ 17 (f); developed a local hazard plan, *see id.* ¶ 17 (c); and created a water emergency response plan.  *See id.* ¶ 17 (d).

During early 2007, George, the Town Administrator, had open heart surgery and took a six week leave of absence. *See* Johnson Dep., 41:20-42:12.  Johnson served as his replacement for five weeks. *Id.*[6]

On May 9, 2007, the Mayor and Commissioners held a "work session," a scheduled public meeting at which they discuss topics but do not vote.  *See* George Dep., 83:7-14.  Johnson and George attended the work session.  *See* Johnson Dec., ¶¶ 6, 12.  At that work session, the topic of hiring a new Assistant Town Administrator was discussed.  *See* Fisona Dep., 25:19-26:1. Johnson was 69 years of age at that time.  *See* Johnson Dep., 44:1-2.  A DVD recording of the May 9, 2007 work session has been made part of the record.   *See* Plaintiff's Exh. 8A, Defendant's Exh. 11 ("DVD").

Lucinda Michelle Henson, Elkton's Administrative Office Secretary, took minutes at such meetings.  *See* Plaintiff's Exh. 9, Defendant's Exh. 28, Deposition of Lucinda Michelle Henson, July 26, 2011, 8:3-11.  She recalled that the discussion about the position of Assistant Town Administrator, a "back up" for the Town Administrator, was prompted by the Commissioners' concerns that if George's health failed, the Town "would be stuck" because George "is a wealth of knowledge."  *Id.* at 12:1-10.

At the May 9, 2007 work session, Storke, who was 65 years old, urged the hiring of a new or additional Assistant Town Administrator, noting that George was "in his sixties" and that

---

[6] Another Elkton employee, Craig Trostle, filled in for George during the last week of his leave, as Johnson had a previously scheduled vacation.  *See id*. at 42:10-19.

Johnson "is no young chick."[7]   *See* DVD; ECF 20 (D.O.B. Reference List).   Storke also commented that the position of Assistant Town Administrator is one that requires training, and that Elkton should hire "a young *man* out of college."   *See* DVD (emphasis added).   The other Commissioners quickly prompted Storke to correct his statement to refer to a "young *person* out of college," but did not respond to the comment regarding a young worker.   *Id*.   Storke also expressed the view that Johnson was not a suitable replacement for the Town Administrator because he "is going to retire one of these days."   *Id*.

As discussed, *infra*, the parties strongly dispute whether the new Assistant Town Administrator was to be a replacement for Johnson or a supplement to Johnson.

Elkton's budget for fiscal year 2008, published May 2, 2007, referred to the "new position" of "Assistant To Administrator" / "Administrator's Assistant."   *See* Defendant's Exh. 9.   The budget included a "Personnel Authorized" section for the "Total Administration Budget," which referred to a Town Administrator, an Administrator's Assistant, an Administrative Secretary, and two Receptionist/Clerks.   *Id*. at 10.   The "Personnel Authorized" section of the "Total Finance Budget" referred to an Assistant Town Administrator / Finance Director, an Assistant Finance Director, a Senior Accountant, and two Finance Clerks.   *Id*. at 11.   The accompanying "budget worksheet" for "Administration," Defendant's Exh. 10, which is not dated, listed the following personnel:

> GEORGE, JR., LH
> HENSON, LM
> JOHNSON, AP
> MANEJWALA, A
> NEW POSITION-CLERK
> NEW-ASST TO ADMIN.

---

[7] This comment is discussed by multiple witnesses.   Some claim that Storke used the phrase "young chick," others "young chicken," and others said "spring chicken."   The distinction is immaterial.

Thus, the budget authorized five Administration positions.  But, the budget worksheet referred to six workers.  Johnson was budgeted as "Assistant Town Administrator / Finance Director" in the "Total Finance Budget."

After Johnson's termination, the Town hired a *replacement* Assistant Town Administrator.  It did not hire an additional or supplemental assistant.

At his deposition, George testified that he saw no reason why Johnson could not replace him (George) in the event he was unable to work.  *See* George Dep., 80:14-81:1.  Mayor Fisona also testified that Johnson could have covered for George "in the event of a prolonged absence." Fisona Dep., 26:16-27:1.

Commissioner Storke testified at his deposition that he made the comment about Johnson being a "young chick" because he was trying to make a point that they could not know what Johnson's health would be like in the future.  The following testimony of Storke is relevant:

Q. Do you recall at that workshop meeting on May 9th, 2007 commenting that
   Andy Johnson was no spring chicken?

A. Yes.

Q. Why did you say that?

A. Just off of the—off of the thing trying to make a point with everybody.  Louis
   was sick.  Andy was like me.  I don't know how long Andy had planned to,
   you know—just like a shot in the dark.  I apologized to him afterwards.  I think
   it was uncalled for, but sometimes I'm humorous like that.

Q. You said that you didn't know how Andy—how long Andy planned to—you
   know.  Did you mean to say how long Andy planned to continue working for
   the town?

A. No, I—I have no regards to anybody working, you know, how—how old they
   are, or anything like that.  I am interested in having the job done.

                              ***

Q. …In that previous answer you said you didn't know how long, and then you

kind of changed the subject.  You didn't know how long what?

A. I don't know how long everybody is going to be healthy.  Is going to be there or what.  You know, I'm no mind reader.  My point of view was I'm just trying to find out what's the plans for the future, you know….

Plaintiff's Exh. 7, Defendant's Exh. 22, Deposition of C. Gary Storke, July 27, 2011, 42:11-43:21.

Commissioner Jablonski testified at her deposition that Storke "constantly" made comments similar to the "young chick" comment to Norman Wilson, the Town Attorney, and to George.  Jablonski Dep., 39:9-40:18.  She claimed that the comments were made "jokingly" and in the context of "You are not getting any older, I am not getting any younger, that type of talk." *Id.* at 40:19-41:20.  At his deposition, Wilson testified that Storke would "kitbiz" with him about how they were "no spring chickens…."  Defendant's Exh. 29, Deposition of Norman Wilson, Sept. 14, 2011, 15:1-17.

Ms. Henson testified that she heard Storke talk about his own age, saying that he was "doing pretty good for an old man."  Henson Dep., 15:2.  But, he never talked about anyone else's age, with the exception of the "young chick" comment about Johnson at the May 9, 2007 work session.  *Id.* at 15:8.

Mayor Fisona testified that Storke talked about Johnson's age with Commissioner Givens, but was "[p]robably joking."  Fisona Dep., 33:12-34:13.  At his deposition, Fisona testified that he did not recall whether the comments about Johnson's age were restricted to the meeting of May 9, 2007.  *Id.* at 33:9-11.  And, Commissioner Givens testified that he and Commissioner Storke would use "little phrases and little quips," such as referring to colleagues as "spring chickens," to tease those colleagues about their "longevity."  Plaintiff's Exh. 5, Defendant's Exh. 24, Deposition of Charles Givens, June 10, 2011, 62:14-64:20.

At his deposition, Johnson averred that Storke told him he "was no spring chicken" on a second occasion "in the town office," but could not recall whether it was before or after the May 9, 2007 meeting. Johnson Dep., 48:19-50:2. He also testified that, on an occasion other than the May 9, 2007 meeting, Storke asserted that he "would like to hire a young man to come in and train to be as [sic] the assistant administrator," but Johnson did not specify when or where this comment was made. *Id.* at 52:13-53:9. Without articulating any particulars, Johnson also testified that Fisona had made comments about his age. *Id.* at 47:4-15. But, he never heard Fisona comment that he did not want to hire or retain older workers. *Id.* at 47:12-14. Johnson also stated that he never heard Givens, Jablonski, or Piner make comments about his age or that would suggest they did not want to hire or retain older workers. *Id.* at 47:16-48:18.

Commissioner Jablonski recalled that, during the summer of 2007, *i.e.*, after the May 9, 2007 meeting, the Commissioners began to discuss terminating Johnson. *See* Jablonski Dep., 25:18-21. Commissioner Givens understood that "any concerns about [Johnson's] performance was [sic] [George's] responsibility, not [the Commissioners']." Givens Dep., 30:8-9. He testified that the Commissioners never told Johnson directly that they were dissatisfied with his performance. *See id.* at 30:2-9. Similarly, Storke stated that Johnson was never told that his performance was unsatisfactory, nor was he given an opportunity to improve. *See* Storke Dep., 21:10-17.

George, who worked with Johnson "pretty much" every day, testified that he did not have "any criticisms of [Johnson's] performance…." George Dep., 40:17-18; 51:1-3. And, when asked if "the mayor or any of the commissioners ever [told him] they were dissatisfied with Mr. Johnson's performance," George answered, "Not that I can recall." *Id.* at 81:2-5. However, when Commissioner Givens was asked whether the Commissioners had ever communicated

dissatisfaction about Johnson's performance to George, he testified: "I believe [George] was informed numerous times about [Johnson's] performance."  Givens Dep., 30:13-16.

Because the Mayor and the Commissioners were part-time employees, they spent little time at work with Johnson.  *See* George Dep., 18:21-19:2; 20:11-13.  For example, Mayor Fisona testified that he only worked approximately eight hours per week, *see* Fisona Dep., 13:8-16, and Commissioner Jablonski testified that she only worked three hours per week.  *See* Jablonski Dep., 31:12-15.  Commissioner Givens testified that he worked "[l]ess than five hours in a week," and would "[p]op in and pop out."  *See* Givens Dep., 21:7-12.  He added that he would "[p]op [his] head in," ask "how things were going, "walk[] around" and "[g]reet people," but was not "internally involved in the operations of people," as he "relied on the town administrator," George, to do so.  *Id.* at 61:11-21.  Commissioner Storke indicated that he did not feel that he "could have completed a performance evaluation for Andy Johnson."  Storke Dep., 47:11-13. He explained: "I wasn't here to evaluate every day his thing here.  And that's not my job anyway.  That is [George's] job." *Id.* at 47:14-17.

At a town meeting held on November 21, 2007, the Mayor and the Commissioners went into a closed door meeting, excluding George, who was not informed as to the subject of the meeting.  *See* George Dep., 127:19-128:13.  After the meeting, George received a letter, signed by the Commissioners and the Mayor, informing him that a decision had been made to terminate Johnson.  *See id.* at 103:20-104:4; *id.* at Attachment 21, Letter of Termination.  When asked why a letter was drafted to terminate Johnson, Commissioner Piner testified that "Lou George indicated that he was good friends with Andy and it's hard for him to terminate him because he's got a long time relationship with—with Andy.  And that was one of the reasons why it was hard

to—I guess to—for the [Commissioners] to communicate through Andy[8] because Lou George and him were good friends." Piner Dep., at 30:10-31:8. Similarly, Commissioner Jablonski testified that a letter was used to terminate Johnson "because [the Commissioners] knew of the friendship between [George] and Mr. Johnson." Jablonski Dep., 27:19-28:2.

George testified that the letter was "the first indication [he] had that the commissioners were dissatisfied with Mr. Johnson." George Dep., 104:5-18. Moreover, he claimed that he had never before or since received a letter from the Commissioners terminating an employee. *Id.* at 104:19-105:3. In George's affidavit of January 20, 2012, however, submitted with the Town's Reply, George said: "The Mayor and Commissioners have been involved in personnel decisions on a number of occasions in addition to that of Andrew Johnson's termination." Defendant's Exh. 33, George Dec., at ¶ 2. He averred that, "for example, the Mayor and Commissioners directed [him] to terminate the employment of Douglas Connell, following their decision to contract with a private company to operate the Town's water and wastewater treatment facilities, and to eliminate the position of Kimberly Kamp, resulting in her termination." *Id.*

After George received the letter regarding Johnson's termination, he met, of his own accord, with Mayor Fisona to ask him to reconsider Johnson's termination. *See* George Dep., at 109:16-110:9. Fisona told George he would get back to him, *id.* at 110:10-12, and later told George that the Commissioners would not reconsider. *Id.* at 111:2-7. Mayor Fisona never provided George with an explanation for the termination. *Id.* at 110:13-20; 111:8-10.

As noted, at the time of his termination, Johnson was 70 years old. *See* Plaintiff's Exh. 3, Johnson Dep., 44:3-4. Mayor Fisona was 65 years old; Commissioner Storke was 65 years old;

---

[8] Context suggests that Commissioner Piner intended to communicate that it was difficult for the Commissioners to communicate with *Johnson* through *George*, as opposed to the other way around.

Commissioner Jablonski was 47 years old; Commissioner Givens was 62 years old; and Commissioner Piner was 50 years old.  *See* ECF 20 (D.O.B. Reference list).

On November 29, 2007, after being informed of his termination, Johnson submitted a letter of resignation.  *See* Defendant's Exh. 16, Letter of Resignation.  He explained he "did not want to have on [his] record a record of being fired, especially since [he] didn't know what he was being fired for, and neither did [his] supervisor."  Johnson Dep., 80:9-18.  Then, on January 31, 2008, Johnson filed a charge of discrimination with the EEOC.  *See* George Dep., at Attachment 27, Charge of Discrimination.  On February 14, 2008, Elkton filed a position statement in response to the charge, authored by George, which did not provide a reason for the termination.  *See id.* at Attachment 28.  Rather, it stated that Johnson's "services were no longer desired" and that "age was not a factor…."  *Id.*  George testified at his deposition that, at the time he prepared the position statement, the Commissioners had not discussed with him why they "felt that [Johnson's] services were no longer needed or desired."  *Id.* at 131:1-3.

In their briefing, the only pre-termination criticism of Johnson's performance to which the parties point was made by Mayor Fisona.  Johnson testified that on several occasions Mayor Fisona criticized him "because [his] desk wasn't piled up with papers," stating that Johnson "never did anything."  Johnson Dep., 55:10-20.  However, Johnson construed the remark "as a joke."  *Id.* at 56:2-7.  And, Mayor Fisona testified that he had objected to the termination of Johnson, but was outvoted by the Commissioners "4 to 1."  *See* Fisona Dep., 14:1-20.

The Commissioners' post-suit explanations for Johnson's termination follow.

Commissioner Storke testified that he was dissatisfied with Johnson's performance because "he loitered through the office quite a bit."  Storke Dep., 18:8-9.  He also testified that, "[w]hen you needed information from him, especially reference finance [sic], if his second

command wasn't here, Mrs. Moran, we had to wait two or three days." *Id.* at 18:10-13.  Yet, Storke could not recall any information he requested from Johnson that was not immediately available, suggesting that it "[m]ight have been police salaries." *Id.* at 19:19-21.  He conceded that he always received the information requested.  *Id.* at 20:4-8.  Storke also claimed that Johnson "never had anything on his desk," *id.* at 19:4-5, and that Johnson "was supposed to be training and schooling on a computer," but "the mayor took the computer after awhile because it wasn't being used." *Id.* at 19:5-7.  He was unable to recall a time when Johnson "didn't do something he was asked to do." *Id.* at 33:3-5.

Commissioner Givens testified that when he came to work he would "find Andy standing around."  Givens Dep., 23:6-17.  However, Givens conceded that Johnson, a salaried employee, "should be able to take breaks when he wanted to take breaks." *Id.* at 25:9-14.  Givens also complained that when he asked Johnson questions, "he couldn't come up with the answer." *Id.* at 25:15-20.  But, Givens admitted that Johnson "would get back to [him] with an answer maybe a day later." *Id.* at 26:10-13.  He was unable to provide a single example of information he requested from Johnson that was not immediately available. *Id.* at 26:18-21.  He also noted: "Andy was not that literate with the computer." *Id.* at 28:19-29:1.

Commissioner Piner testified, without giving any specific examples, that Johnson was terminated because "[t]here was questions that was [sic] asked, he could not provide the answers. He had to go to his secretary to provide the answers that we needed that he should have been able to provide to us."  Piner Dep., 22:9-13.  He also noted that he had received "several complaints from residents" about Johnson, *id.* at 39:4-8, but did not cite those complaints as a reason for termination.  He was unable to offer particular details about the complaints, other than

that some of them referred to Johnson as "arrogant," and may have been made by residents from whom Johnson attempted to collect bills.  *Id.* at 39:9-18.

Commissioner Jablonski testified that she "would go into the office and ask [Johnson] for some financial documents and they weren't available.  He needed to ask someone else and get back to [her]."  Jablonski Dep., 18:17-19.  Although she could not recall any specific instances, she posited that she may have asked for "a copy of water rates for the past five years."  *Id.* at 19:19-20.  She also conceded that she always received the documents she requested, normally within a day.  *Id.* at 20:10-17.  In addition, Commissioner Jablonski noted that Johnson "did not have a CPA," *id.* at 18:14-16, although she acknowledged that she did not know if that was a job requirement.  *Id.* at 19:14-16.

Mayor Fisona testified that the only criticism of Johnson he recalled from the November 21, 2007 closed door meeting was the allegation that Johnson had been seen "standing around." Fisona Dep., 14:21-15:8.  When asked whether, in his opinion, that was a sufficient reason to justify termination, he answered "No," stating: "A lot of people stand around."  *Id.* at 15:9-13. Fisona also testified that Johnson always answered his questions, and always provided him with the documents he needed.  *Id.* at 15:14-20.  He maintained that Johnson never failed to do something he was asked to do.  *Id.* at 18:17-19.

In its briefing, defendant makes much of a letter of October 24, 2007, submitted to the Mayor and the Commissioners by Richard Kilmon, then a recently resigned Elkton human resources manager.  The letter was critical of Johnson, as well as other Elkton employees.  *See* Defendant's Exh. 14 (the "Kilmon letter").  However, neither the Mayor nor any of the Commissioners cited the Kilmon letter as a reason for Johnson's termination.

Although Jablonski stated that the Kilmon letter prompted the discussion of Johnson's performance, she did not cite it as a reason for the termination.  *See* Jablonski Dep., 18:21-19:3. Similarly, Mayor Fisona testified that the Kilmon letter prompted the discussion of Johnson's performance, but did not cite it as a reason for the termination.  *See* Fisona Dep., 16:4-14.  And, when asked why Johnson was terminated, neither Givens nor Piner mentioned the Kilmon letter.[9]

Storke testified that he "didn't read the letter because [he] thought it was between two employees.  [He] didn't pay attention to it."  Storke Dep., 32:15-18.  In his view, there was "bad blood between [Kilmon] and Andy."  *Id.* at 32:7.  Similarly, Mayor Fisona testified that there was "friction" between Kilmon and Johnson, Fisona Dep., 22:11-13, which he attributed to Johnson's opposition to the employee compensation plan proposed by an outside consultant Kilmon had hired to review employee compensation.  *Id.* at 21:19-22:13.  If the plan had been adopted, Kilmon's compensation would have increased from $50,000.00 to between $70,000.00 and $80,000.00.  *See* Plaintiff's Exh. 10, Defendant's Exh. 26, Deposition of Richard T. Kilmon, July 27, 2011, 51:12-15; 56:2-17.  Mayor Fisona testified that he did not respond to the letter, nor did he ever speak to Johnson or George about it.  *See* Fisona Dep., 23:4-24:1.  Fisona also observed that other Elkton employees, including George, were criticized in the Kilmon letter, but were not terminated.  *Id.* at 21:1-18.

After Johnson's departure, Kimberly Kamp was hired as Assistant Town Administrator. *See* Plaintiff's Exh. 11, Deposition of Kimberly A. Kamp, July 27, 2011, 19:2-7.  She began

---

[9] Defendant dedicates a full four and a half pages to the Kilmon letter.  *See* Memo at 10-14.  In the Reply, at 15 n.4, defendant asserts: "[T]he only reason [Givens and Piner] did not [cite the letter] is because Plaintiff's counsel did not ask them about the Kilmon letter at their depositions."  But, plaintiff's counsel asked both Givens and Piner an open-ended question about the reasons for Johnson's termination.  Each gave the reasons discussed, *supra*; neither mentioned the Kilmon letter.  As it is clear that the Kilmon letter did not play a role in Johnson's termination, beyond perhaps prompting a review of his performance, I have not discussed the contents in detail.

working for Elkton on June 16, 2008, *id.* at 20:14-18, when she was 26 or 27 years of age.  *Id.* at 5:7-8.[10]  George testified that it was his responsibility to hire Kamp, *see* George Dep., 126:8-10, but the Commissioners had the "final say" with regard to the decision.  *See* Piner Dep., 50:15-18. George regarded Johnson as more qualified than Kamp, as Kamp had no prior work experience in municipal government.  *See* George Dep., 125:9-126:7.  At her deposition, Kamp conceded that, although she had a Bachelor's degree in Criminology, she lacked the experience referred to in the "minimum training and experience" section of the job description for the position.  *See* Kamp Dep., 24:7-26:2; *id.* at Attachment 3, Assistant Town Administrator Job Description.

Steven Repole was hired to replace Johnson as Finance Director.  *See* Plaintiff's Exh. 12, Defendant's Exh. 30, Deposition of Steven Repole, Sept. 14, 2011, 15:13-16.  He began working for the Town in April 2008, *id.* at 18:15-18, at the age of 54 or 55.  *Id.* at 4:18-19.[11]  Although George was responsible for hiring Repole, the decision was made with the "input" of the Commissioners and the Mayor.  *See* George Dep., 117:10-20.

Repole possesses a Bachelor's degree in Accounting, as well as a Master's degree in Business Administration, and is a certified public accountant.  *See* Defendant's Exh. 31 at 2, Steven Repole's Resume.  However, the job description for the position of Finance Director, circulated after Johnson's departure, did not require a candidate to be a certified public accountant.  *See* Repole Dep. at Attachment 1, Director Finance Department Job Description. Nor does Repole perform any tasks that Johnson did not also perform.  *See* George Dep., 121:5-8.  Like Kamp, Repole had no prior experience working in municipal government, although he had worked for the Cecil County Board of Education as an Assistant, and later Manager, of Accounting and Finance from 1991 to 2002, and for the Cecil County Treasurer's Office, as

---

[10] The record reflects that Kamp was born in 1981, but does not include her date of birth.

[11] Repole was born in 1953, but his precise birth date does not appear in the record.

Senior Accountant / Budget Analyst, from 1985 to 1991. *See* Defendant's Exh. 31 at 2, Steven Repole's Resume.

## Standard of Review

As noted, defendant has moved for summary judgment pursuant to Fed. R. Civ. P. 56. Under Rule 56(a), summary judgment is properly granted only if the movant shows that "'there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting former Fed. R. Civ. P. 56(c)). In resolving the motion, the Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Scott*, *supra*, 550 U.S. at 378. The nonmoving party must demonstrate that there are disputes of material fact so as to preclude the entry of judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, *supra*, 475 U.S. at 586; *see In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999). Stated another way, "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts'" showing that there is a dispute of material facts. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see Celotex Corp.*, 477 U.S. at 322-24.

The "judge's function" in reviewing a summary judgment motion is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue

for trial." *Anderson, supra,* 477 U.S. at 249.  If "the evidence is such that a reasonable jury could return a verdict" for the nonmoving party, there is a dispute of material fact that precludes summary judgment. *Id.* at 248.

### Discussion

As noted, plaintiff's claim of age discrimination is based on the ADEA.  *See* 29 U.S.C. § 633a.  Under that statute, a plaintiff must ultimately prove "that age was the 'but-for' cause of the challenged employer decision." *Gross v. FBL Financial Services, Inc.*, 129 S.Ct. 2343, 2351 (2009).

In general, there are "two avenues" at trial by which a plaintiff may prove intentional employment discrimination. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004).  The first is to offer "'direct or indirect'" evidence of discrimination, under "'ordinary principles of proof.'" *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted).  "To avoid summary judgment" when proceeding under ordinary principles of proof, "'the plaintiff must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact.'" *Rhoads v. FDIC*, 257 F.3d 373, 391 (4th Cir. 2001) (internal citations and quotation marks omitted; alteration in original).

The second method for the plaintiff is to follow the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[12]

---

[12] *McDonnell Douglas* involved a claim of racial discrimination in hiring under Title VII of the Civil Rights Act of 1964.  In *Gross*, 129 S. Ct. at 2349 n.2, the Supreme Court observed that it "has not definitively decided whether the evidentiary framework of *McDonnell Douglas*…is appropriate in the ADEA context."  Nevertheless, prior to *Gross*, the burden-shifting methodology endorsed by *McDonnell Douglas* was adapted for use in cases of age and disability discrimination.  *See, e.g., Raytheon Co. v. Hernandez*, 540 U.S. 44, 49-50 & n.3 (2003) (applying *McDonnell Douglas* framework to claim of disability discrimination in employment

An employee who proceeds under the *McDonnell Douglas* approach must first establish a "prima facie case of discrimination." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010).[13]   Although the precise formulation of the required prima facie showing will vary in "different factual situations," *McDonnell Douglas*, 411 U.S. at 802 n.13, the plaintiff is generally required to show that the employer took adverse action against an employee who was qualified for employment, "under circumstances which give rise to an inference of unlawful discrimination." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

"[T]o establish a prima facie case of unlawful age discrimination," a plaintiff "must show," by a preponderance of the evidence, "that (1) he is a member of the protected class; (2) he was qualified for the job and met [his employer's] legitimate expectations; (3) he was discharged despite his qualifications and performance; and (4) following his discharge, he was replaced by a substantially younger individual with comparable qualifications." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 513 (4th Cir. 2006) (citing *O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 312-13 (1996); *Causey v. Balog,* 162 F.3d 795, 802 & n. 3 (4th Cir. 1998)).

If the plaintiff establishes a prima facie case, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action.  *Hoyle v. Freightliner, LLC*, 650

---

under ADA); *Laber v. Harvey*, 438 F.3d 404, 430 (4th Cir. 2006) (applying *McDonnell Douglas* framework to federal employee's claim of age discrimination under ADEA); *Hooven-Lewis v. Caldera*, 249 F.3d 259, 266-68 (4th Cir. 2001) (applying *McDonnell Douglas* framework to federal employee's claim of disability discrimination in employment under the Rehabilitation Act).

[13] Defendant dedicates a large portion of its Memo to its assertion that "plaintiff has failed to come forward with direct or indirect evidence of intentional discrimination." Memo at 32 (edited for capitalization).  *See* Memo at 32-36.  In its Opposition, plaintiff restricts its argument to the *McDonnell Douglas* proof scheme, and does not argue that it could succeed via the "first avenue." Accordingly, this Opinion will address only the arguments made with respect to the "second avenue."

F.3d 321, 336 (4th Cir. 2011) (explaining this principle in the context of a sex discrimination case brought under Title VII). When the defendant meets its burden, the plaintiff must then prove, by a preponderance of the evidence, "that the proffered reason was not the true reason for the employment decision," and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256 (explaining this principle in the context of a sex discrimination case brought under Title VII). *See also Adams v. Trustees of Univ. of North Carolina-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) (stating that, "in demonstrating the Defendants' decision was pretext, [the plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995) (emphasis in *Jiminez*)).

The parties do not dispute that Johnson is a member of a protected class, or that his termination constituted an adverse employment action. However, defendant contends that plaintiff cannot establish a prima facie case of age discrimination because Johnson was not a qualified employee meeting his employer's legitimate expectations at the time of his termination, and because he was not replaced by someone substantially younger with comparable qualifications. Defendant also argues that plaintiff cannot show that Elkton's reasons for terminating Johnson were pretextual, and that age discrimination was the 'but-for' reason for Johnson's termination.

As indicated, in order to establish a prima facie case, the plaintiff must show by a preponderance of the evidence, *inter alia*, that Johnson was qualified for his position, and, at the time of the adverse employment action, was meeting his employer's legitimate expectations. *See Hill, supra*, 354 F.3d at 298 ("[Plaintiff] has failed to establish a prima facie case of...age discrimination because...she has failed to demonstrate that she was performing her job duties at a

level that met [defendant's] legitimate expectations."). Plaintiff must show that "he was 'qualified' in the sense that he was doing his job well enough to rule out the possibility that he was fired for inadequate job performance, absolute or relative." *Warch*, *supra*, 435 F.3d at 515 (citation and some internal quotation marks omitted).

Occasionally, "consideration of the employer's legitimate job expectations at the prima facie stage" requires the court to consider "evidence the employer would typically present in the second stage of the *McDonnell Douglas* framework, that is, where the employer offers the legitimate, non-discriminatory reason for the termination." *Id*. Put another way, a plaintiff terminated for poor performance might find himself in the conundrum of having to prove, at the prima facie stage, that his performance was in fact satisfactory in order to proceed to the later stage in the proof scheme in which he can argue that, although his employer expressed dissatisfaction, it was a pretext for discrimination.

In *Warch*, the Fourth Circuit acknowledged that it was "cognizant of the danger that courts might apply the 'expectations' or 'qualification' element of the prima face [sic] too strictly in some cases, resulting in the premature dismissal of potentially meritorious claims of unlawful discrimination." *Id*. at 516. Fourth Circuit precedent is such that "because a plaintiff must show by a preponderance of the evidence that he met the employer's legitimate job expectations to prove his prima facie case, the employer may counter with evidence defining the expectations as well as evidence that the employee was not meeting those expectations." *Id*. at 515-16. As the Fourth Circuit said, "To require otherwise would turn the plaintiff's burden at the prima facie stage into a mere burden of production…." *Id*. at 516. It is, then, the perception of the employer that is relevant in determining whether plaintiff was meeting his employer's legitimate expectations at the time he was terminated. *See Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280

(4th Cir. 2000) ("'It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.'")  (citation omitted).

However, "where application of the qualification or expectation element of the prima facie case seems to preclude an otherwise meritorious claim, the plaintiff is free to demonstrate that the employer's qualifications or expectations are not, in fact, 'legitimate.'"  *Warch*, 435 F.3d at 517.  And, at the prima facie case stage, a "plaintiff's burden is 'not onerous.'"  *Id.* at 515 (quoting *Burdine, supra,* 450 U.S. at 252).  The *Warch* Court relied on "the flexibility of the *McDonnell Douglas* inquiry" to "protect[] plaintiffs" from the conundrum described above.  *Id.* at 517.  It cited *Brinkley v. Harbour Recreation Club,* 180 F.3d 598, 611 (4th Cir.1999), for the proposition that "the *McDonnell Douglas* framework should not be applied in a 'rigid, mechanized, or ritualistic' manner," and *Moore v. City of Charlotte,* 754 F.2d 1100, 1105 (4th Cir. 1985), for the proposition that the *McDonnell Douglas* framework is "less useful" in the context of an adverse action against an employee than in the context of hiring.  *Warch,* 435 F.3d at 517.  These considerations are pertinent "to the question of whether [plaintiff] has produced sufficient evidence from which a jury could conclude that [Johnson] met [Elkton's] legitimate job expectations."  *Id.*

## I.

In Elkton's view, Johnson "was not meeting the Mayor and Commissioners' legitimate expectations at the time of his termination."  Memo at 39.  The Town argues, *id.* at 39-40:

> The Mayor and Commissioners terminated [Johnson] because they did not believe that [he] was an effective Finance Director, they did not believe he was performing his job, and because of the many issues raised in the Kilmon letter.[14]

---

[14] As noted, neither the Commissioners nor the Mayor relied on the Kilmon letter, or any of the allegations made in that letter, as a reason for Johnson's termination.  Defendant also argues that the video of the May 9, 2007 meeting "depicts Commissioner Piner criticizing [Johnson's] preparation of the budget, and [Johnson] arguing with Commissioner Piner about it."

> By [Johnson's] own admission at his deposition, the Mayor had approached [him]
> several times prior to [his] termination to complain that [he] did not seem to be
> doing any work.
>
> ***
>
> All of the Commissioners testified that they were dissatisfied with [Johnson's]
> performance, as he was unable to respond to their questions without putting them
> off to consult with one of his subordinates, and he seemed to be socializing and
> not doing any work.

Defendant continues: "[R]egardless of whether Mr. George ([Johnson's] supervisor and close friend) was satisfied with [Johnson's] performance, the Town's elected officials were [Johnson's] employer, they had the right to terminate [Johnson], and there is no dispute that [Johnson] was terminated because he was not meeting their legitimate expectations." *Id.* at 41.

The EEOC characterizes as "untenable" the argument that Johnson failed to meet his employer's legitimate expectations. Opposition at 15. Plaintiff also maintains that "[w]hen the oral testimony of the employee and decision maker collide the matter becomes a 'credibility case' and summary judgment is not available." *Id.* at 16 (quoting *Hildebrandt v. W.R. Grace & Co.*, 492 F.Supp.2d 516, 523 (D. Md. 2007)).

In support of its contention that Johnson was a qualified employee for the purpose of establishing a prima facie case, the EEOC argues that "Defendant noted no deficiencies with Johnson's performance while he worked for Elkton"; that "Johnson received every raise for which he was eligible"; he "received yearly performance reviews which were always positive"; and the Commissioners "never told Johnson or his immediate supervisor George that his performance was unacceptable until [they] voted to terminate Johnson." Opposition at 15. Pointing to the awards the Finance Department received under Johnson's leadership, plaintiff observes that the "Fourth Circuit has…held that receipt of awards and accolades constitutes

---

Memo at 40; *see id.* at 7 (describing this interaction). However, I agree with plaintiff that "[s]uch an argument is a red herring,…since none of the Commissioners cited Johnson's attitude as a grounds for termination." Opposition at 16 n.10.

evidence that the employee was meeting his employer's legitimate expectations." *Id.* at 17 (citing *Loveless v. John's Ford, Inc.*, 232 F. App'x 229, 235 (4th Cir. 2007)). And, plaintiff posits that "the best evidence that Johnson was meeting his employer's legitimate expectations is the testimony of Johnson's supervisor, George, that Johnson was meeting his expectations." Opposition at 17.  The EEOC argues:

> In the absence of documentary evidence regarding the employee's poor performance, "as a matter of law, plaintiff's historical account of his performance…may be accepted by a fact finder as *first hand fact testimony based on personal knowledge*, every bit as much as the decision-maker's *search of his recollection of plaintiff's performance and oral testimony about that performance* may be accepted as 'fact.'"

*Id.* at 16 (quoting *Hildebrandt, supra*, 492 F. Supp. 2d at 523) (emphasis in *Hildebrandt*).

In its Reply, Elkton argues that the opinion of George and Johnson's "self-appraisal" are irrelevant to the consideration of whether Johnson was satisfactorily performing his duties in the view of the Mayor and Commissioners.  *Id.* at 6.  Defendant also notes that "the Mayor and Commissioners were not legally required to inform Johnson of his deficiencies and give him an 'opportunity to improve,'" *id.* at 14, or provide him "with an explanation for the termination," and that an employer "can discharge an at-will employee for any lawful reason or no reason at all."  *Id.* at 16.  Defendant also rejects plaintiff's application of *Hildebrandt*, arguing that there is "no 'credibility' clash or dispute of material fact because Johnson *admitted* at his deposition that the Mayor complained to him on several occasions prior to his termination regarding his poor performance / failure to do any work."  *Id.* at 10.[15]

---

[15] Defendant also argues that "there is not an absence of documentary evidence because the video of the May 9, 2007 meeting displays the Commissioners criticizing Johnson's preparation of the budget."  *Id.* at 9.  However, as noted, the Commissioners do not cite criticism of Johnson's preparation of the budget as a reason for their dissatisfaction with his performance. Therefore, this argument is not on point.  Defendant does not argue that there is documentary

Applying the precepts discussed earlier, a reasonable jury could readily conclude that Johnson met Elkton's *legitimate* job expectations. It is undisputed that Johnson received every raise for which he was eligible and, in the course of about eight years of employment, received positive annual performance reviews. *See* George Dep., 66:9-14; Johnson Dec., ¶ 18. Moreover, the Finance Department received several awards under Johnson's leadership. *See* Fisona Dep., 18:15-16. Nor is there any evidence that Elkton ever communicated any criticism to Johnson about his performance while he was in the Town's employ, with the exception of the Mayor's comments about Johnson's desk, which Johnson construed as a joke. *See* Johnson Dep., 56:2-7. And, it can be inferred that the Mayor's complaint was not serious, as the Mayor made clear he was opposed to Johnson's termination. *See* Fisona Dep., 14:1-20.

There is also a dispute of material fact with respect to whether any criticism of Johnson's performance was communicated by the Town to Johnson's supervisor, George. *See* George Dep., 81:2-5. Although George was not a decision maker with respect to Johnson's termination, and it was not George's expectations that Johnson had to meet in order to establish a prima facie case, a jury could reject Elkton's claim that George's opinion was "irrelevant" with respect to assessing whether Johnson met Elkton's *legitimate* expectations. Unlike the Mayor and the Commissioners, who testified that they were only in the office a few hours per week, George and Johnson were full-time employees, and George arguably was in a better position to assess Johnson's performance. *Id.* at 40:17-18. Nor is George's opinion unimportant, as defendant suggests, merely because he and Johnson were friends. To be sure, Commissioners Piner and Jablonski stated that Johnson was terminated by letter because George's friendship with Johnson would have made it difficult for him to terminate Johnson. *See* Piner Dep., 30:10-31:8; Jablonski

---

evidence of any of the criticisms the Mayor and Commissioners *do* cite as reasons for their dissatisfaction with Johnson's performance.

Dep., 27:19-28:2.[16]   But, this does not compel a finding that George's positive assessment of Johnson's performance was the result of bias.   Moreover, if the Town failed to lodge any criticism of Johnson's performance to his Supervisor, George, a jury could determine that the Town's after-the-fact complaints were bogus, and fabricated to justify the unlawful conduct of the Commissioners.

A reasonable jury could also find that the standards defendant claims Johnson failed to meet were unreasonable and illegitimate.   It is true that Johnson was not a certified public accountant, but that was not a job requirement for the Finance Director.   *See* Johnson Dep., at Attachment 5, Job Description for Director of Finance.   Although Storke and Givens alleged that Johnson was not competent with computers, when Elkton advertised for a new Finance Director and Assistant Town Administrator after Johnson's departure, Elkton did not include computer literacy as a job requirement.   *See id.*; Defendant's Exh. 13, Job Description for Assistant Town Administrator.   A jury could also determine that the Town's job performance standard was unreasonable to the extent that it required a salaried employee, entitled to take reasonable breaks during the work day, never to be seen "standing around" during the few hours per week that the Mayor or the Commissioners were in the office.   *See* Givens Dep., 25:9-14.   And, a jury could find it unreasonable to expect Johnson immediately to recall or produce data about police salaries

---

[16] Defendant cites these particular portions of the record for the proposition that, "[e]ven assuming it were true that no one complained to George about Johnson's performance, it is nevertheless undisputed that was because the Mayor and Commissioners believed doing so would be futile due to the close friendship between George and Johnson, and because of George's continuous refusal to take any corrective action with respect to the issues with Johnson."   Reply at 12.   The pages cited by Elkton provide absolutely no support for this assertion, however.   As noted, they merely show that the Commissioners terminated Johnson by letter because of their belief that George's friendship with Johnson would have made it difficult for George to terminate Johnson.

or five years' worth of water rates, rather than taking a reasonable time to look up the information or consult with his assistant. *See* Storke Dep., 19:19-21; Jablonski Dep., 19:19-20.[17]

The EEOC asserts that the "evidence in this matter strongly resembles the evidence" in *Reed v. Buckeye Fire Equipment*, 241 F. App'x 917 (4th Cir. 2007). *See* Opposition at 16. In *Reed*, the Fourth Circuit said, 241 F. App'x at 926-27:

> [F]or summary judgment purposes there is sufficient evidence to establish that [plaintiff employee] was meeting [defendant employer's] legitimate expectations when he was terminated. [Defendant] continuously employed [plaintiff] at a high level of its organization for nearly seven years, and granted him several raises and bonuses during that time. [Defendant] gave him significant responsibility for designing, procuring, supervising, troubleshooting, and repairing critical components of the manufacturing infrastructure for its most important products. There is no documentation of any of the alleged problems with [plaintiff's] performance or work habits. Therefore, we find that there is at least a triable issue of fact in this regard.

*See also Murry v. Jacobs Technology, Inc.*, No. 10–771, 2012 WL 1145938, *10 (M.D.N.C. Apr. 5, 2012) ("Viewing the facts in the light most favorable to [plaintiff], there is a question of fact regarding whether [he] was meeting [defendant's] *legitimate* expectations" because, prior to his termination, he had received no warning that his performance was deficient, the skills he allegedly lacked were not job requirements, and his immediate supervisors viewed his work positively) (emphasis in original).

It is true that "'[i]t is the perception of the decision maker which is relevant....'" *Hawkins*, *supra*, 203 F.3d at 280 (citation omitted). But, a "plaintiff is free to demonstrate that the employer's qualifications or expectations are not, in fact, 'legitimate'" in order to establish a prima facie case. *Warch*, 435 F.3d at 517. As the *Warch* Court noted, the burden on a plaintiff to establish a prima facie case is more than a burden of production, but is not intended to be

---

[17] As noted, police salaries and five years of water rates records are the only examples in the record of Johnson's inability to recall immediately information requested by the Mayor or the Commissioners.

onerous.  *Id.* at 515-16.   A reasonable jury could conclude that Johnson established, by a preponderance of the evidence, that he met Elkton's *legitimate* job expectations.

II.

Defendant also contends that plaintiff cannot show that Johnson was replaced by someone substantially younger with comparable qualifications.  Memo at 41-42.  It is undisputed that both Kamp and Repole are substantially younger than Johnson.  *See* Reply at 21.  But, defendant insists that "Kamp was not hired as a replacement for Johnson."  *Id*. at 19.  Rather, she "was hired to fill the entirely *new* position of 'understudy' and assistant to George."  *Id.* (emphasis in Reply).   In support of this contention, defendant points to the funding for a new position in the 2008 budget and evidence that, at the May 9, 2007 meeting, the Commissioners discussed bringing in a new person, rather than replacing Johnson.  As to Repole, Elkton argues: "Repole was clearly more qualified than [Johnson] based upon his education and experience.  Unlike [Johnson], Repole has a bachelor's degree.   Unlike [Johnson], Repole has a master's degree.  Unlike [Johnson], Repole is a certified public accountant."  Memo at 42.

The EEOC maintains that Kamp was in fact hired to replace Johnson as Assistant Town Administrator.  Opposition at 18.  According to plaintiff, both "Kamp and Repole have inferior qualifications to Johnson," because neither "had experience in municipal government."  *Id*. at 19.  In contrast, argues the EEOC, "Johnson had worked as Finance Director of Smyrna, Delaware for eleven years and had been with Elkton for eight years."  *Id.*  Plaintiff also contends that Repole's status as a certified public accountant is not dispositive because "being a CPA is not a requirement for the Finance Director position."  *Id*.

In my view, there is a clear dispute of material fact regarding whether Kamp was hired to replace Johnson as Assistant Town Administrator.   Defendant argues: "Plaintiff's arguments

seem to disregard the fact that there could be, and were, two positions funded to be so-called 'assistants' to the Town Administrator, each having their own role." Reply at 20. But, even if, at the time the 2008 budget was prepared, and at the time of the May 9, 2007 meeting, the Town contemplated hiring an additional person to assist George, without terminating Johnson, the fact remains that Kamp alone was hired to serve as Assistant Town Administrator, with responsibilities that are arguably the same as those that Johnson had before he was discharged. *See* Kamp Dep., 19:2-7. Defendant never asserts, and it does not appear from the record, that two assistants to the Town Administrator were hired after Johnson's departure. Rather, Kamp, who was in her twenties when she was hired, and who is considerably younger than Johnson, became the new Assistant Town Administrator. At that time, she was the only one person who held that position.

A reasonable jury could find that Kamp was not as qualified as Johnson. Although she had a Bachelor's degree in Criminology, she lacked the experience referred to in the "minimum training and experience" section of the job description for the Assistant Town Administrator position. *See* Kamp Dep., 5:7-8; 24:7-26:2; *id.* at Attachment 3, Assistant Town Administrator Job Description. And, unlike Johnson, Kamp had no prior experience in municipal government. *See* George Dep., 125:9-126:7.

Moreover, a reasonable jury could find that Repole, who is substantially younger than Johnson, possessed qualifications comparable to those of Johnson. *Compare Devan v. Barton-Cotton, Inc.*, No. 97-1023, 1998 WL 183844, *3-4 (4th Cir. Apr. 20, 1998) (employee and replacement not of comparable qualifications where employee was a high school graduate without any post-secondary education or directly relevant experience, and replacement was an MBA who had previously worked for "the largest consulting firm in the world"); *Walsh v. Ciba-*

*Geigy Corp.*, No. 96-1528, 1997 WL 538006, *2 (4th Cir. Sept. 2, 1998) (employee and replacement not of comparable qualifications where it was undisputed that employee "was not qualified to perform the safety or engineering aspects" of the position, unlike his replacement, an engineer).

Johnson has "a hundred credit hours of college-level training" out of the one hundred and twenty credit hours necessary to graduate, and an additional "103 hours…training as a certified municipal clerk." Johnson Dep., 7:12-9:5. But, he does not have a college degree. *Id.* Nor is he a certified public accountant. *Id.* Yet, despite Repole's superior educational background, he does not perform any tasks as Finance Director that Johnson did not perform or was unable to perform. *See* George Dep., 121:5-8. Moreover, for about two decades, Johnson worked as Finance Director for various municipalities. In contrast, Repole had no previous experience working for a municipality or as a finance director. Rather, he worked for the Cecil County Board of Education as an Assistant, and later Manager, of Accounting and Finance from 1991 to 2002, and for the Cecil County Treasurer's Office, as Senior Accountant / Budget Analyst from 1985 to 1991. *See* Defendant's Exh. 31 at 2, Steven Repole's Resume.

Alternatively, Elkton suggests that it was not attempting to replace Johnson as Assistant Town Administrator, because he was not even functioning in that role. *See* Memo at 6 ("by 2007 the Commissioners no longer considered [Johnson] to be functioning any longer as Assistant Town Administrator"); Reply at 20 ("[E]ven assuming that Johnson still functioned partly as an assistant to George…"). In support of its position, the Town points to Johnson's testimony that, on two occasions in 2007, prior to the May 2007 meeting, Commissioner Givens questioned whether Johnson was the Assistant Town Administrator. *See* Johnson Dep., 84:16-85:12. It also cites Johnson's testimony that most of his duties were related to his role as Finance Director. *Id*.

The Town's position is not supported by the record.   At the time of Givens's inquiry, George assured Givens that Johnson was the Assistant Town Administrator.  *Id.* at 85:11-12.   And, at their depositions, Givens and Jablonski confirmed that Johnson was serving as Assistant Town Administrator at all relevant times.  *See* Givens Dep., 54:11-13; Jablonski Dep., 23:7-10.

III.

Defendant asserts: "Even if this Court were to find that Plaintiff has established a prima facie case, Plaintiff cannot show that the Town's non-discriminatory reasons for firing [Johnson] are merely a 'pretext' for age discrimination and that age discrimination was the 'but for' reason for [Johnson's] termination."  Memo at 43.  In support of its assertion, defendant reiterates that Mayor Fisona commented on Johnson's clean desk during the course of Johnson's employment with Elkton, and that the Mayor and the Commissioners believed Johnson spent an excessive amount of time "standing around" and was unable to answer questions put to him with immediacy.  *Id.*

Elkton also asserts: "All of the Commissioners testified that neither [Johnson's] age nor his so-called 'longevity' had anything to do with his termination and, indeed, that they were not even aware of [Johnson's] age when they terminated him."  *Id.* at 44.  Defendant notes that "the Mayor and most of the Commissioners were, like [Johnson], in their 60's," and concludes: "It simply does not make sense that people approximately the same age as [Johnson] would terminate him because of his age."  *Id.*  In defendant's view, "[t]he only scintilla of evidence Plaintiff has come forward with is the 'no young chicken' comment by Commissioner Storke."  *Id.* at 44-45.  And, defendant contends that the video of the May 9, 2007 meeting "plainly indicates that Storke and [Johnson] were simply exchanging humorous comments about their shared ages, unrelated to [Johnson's] job or his much later termination."  *Id.* at 45.

The EEOC counters: "The tortured process by which Defendant has attempted to justify Johnson's termination, coupled with Storke's public remarks about Johnson's age create a material issue of fact as to whether discrimination has occurred."  Opposition at 19-20.  Plaintiff emphasizes the post hoc nature of defendant's explanations for Johnson's termination, noting that defendant "offered no explanation when it terminated Johnson," never gave George "an explanation for the decision" even though he was "charged with responding to Johnson's charge of discrimination on behalf of the Town," and provided no reason for Johnson's termination "[d]uring the EEOC's administrative investigation."  *Id.* at 20-21.  Plaintiff posits: "Post hoc explanations of an employer's actions are evidence of pretext."  *Id.* at 21 (citing *Dennis v. Columbia Colleton Medical Center, Inc.*, 290 F.3d 639, 647 (4th Cir. 2002)).[18]

In reply, Elkton reiterates that, along the way, it was not obligated to inform Johnson of the deficiencies in his performance, nor was it required to afford him an opportunity to improve, or to explain the grounds for termination.  Reply at 23-24.

Plaintiff also attempts to demonstrate the falsity of the "post hoc" reasons for Johnson's termination, reiterating arguments it made with respect to the alleged illegitimacy of defendant's stated job expectations, discussed *supra*.  Noting that defendant cites repeatedly to Mayor Fisona's comments about Johnson's clean desk, the EEOC emphasizes that Johnson regarded the remarks as "a joke," and that Fisona, in any event, did not believe Johnson should be terminated. Opposition at 23.  Plaintiff also asserts: "It is not disputed that Johnson earned every raise and received positive performance evaluations.  This would not be possible if he were not working."

---

[18]  Plaintiff also complains about defendant's repeated references to the "highly inflammatory" Kilmon letter and Johnson's conduct at the Commissioners' meeting, which it views as a "personal attack."  *Id.* at 21-22.  Plaintiff observes that neither the Kilmon letter nor Johnson's "attitude" has been cited by the Mayor or the Commissioners as a reason for terminating Johnson.  *Id.*

*Id.* With respect to the claim that Johnson was "standing around," the EEOC argues: "Defendant fails to quantify how much Johnson stood around, explain why it is acceptable for other employees to stand around," as Mayor Fisona testified that "standing around" is common for Town employees, "or reconcile [Johnson's] standing around with the raises and positive performance evaluations he received." *Id.* at 24. Further, plaintiff states: "Whether the Commissioner's desire for an immediate answer to every question is a legitimate expectation, as opposed to a pretext for discrimination, is…a question of fact." *Id.*

The EEOC insists that Storke's comments at the May 9, 2007 meeting reveal age bias. *Id.* at 25. Its interpretation of the video is wholly distinct from defendant's interpretation, discussed above. In plaintiff's view, "[t]he recording makes it clear that what was being sought was a younger person to substitute for George and serve as a long-term replacement who, unlike Johnson, was unlikely to retire soon." *Id.* With regard to defendant's argument that, as the Mayor and Commissioners themselves were over 40, they were unlikely to discriminate on the basis of age, the EEOC observes that "this inference has been explicitly rejected by the Supreme Court in the context of race and sex discrimination." *Id.* at 28 (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998)). Plaintiff also claims that "Johnson looks older than all of the other participants [at the May 9, 2007 meeting] except possibly Storke," and was "the only person at the meeting who was born in the 1930s." *Id.* at 29. Plaintiff concludes, *id.* at 32:

> After an employee is terminated an employer may brainstorm any number of justifications for the decision. But whether these post hoc reasons are the true reasons is a question of fact. When, as is the case here, the employer commented on the employee's age, expressed a preference for youth, and terminated the employee without an explanation, it is appropriate for a jury to determine if age was indeed the motive.

It is true that an age discrimination plaintiff bears a heavy burden and must ultimately prove "that age was the 'but-for' cause of the challenged employer decision." *Gross*, *supra*, 129 S. Ct. at 2351. But, in my view, defendant has provided sufficient evidence for a reasonable jury to find that defendant's given reasons for Johnson's termination were pretextual, and that age was the but-for cause of his termination.

A reasonable jury could reject the Town's claim that Johnson spent an excessive amount of time "standing around," because defendant has failed to point to any negative effect on performance attributable to such conduct. *See, e.g.,* Fisona Dep., 18:17-19 (Johnson never failed to do something he was asked to do); Storke Dep., 33:3-5 (same). And, a jury could find pretextual a complaint that Johnson was unable to answer, with immediacy, questions put to him about data regarding police salaries and five years' worth of water rates, *see* Storke Dep., 19:19-21; Jablonski Dep., 19:19-20, and such information was usually provided within a day. *See* Givens Dep., 26:10-13; Jablonski Dep., 20:10-17; Storke Dep., 20:4-8; Fisona Dep., 15:14-20.

At the risk of repetition, there is evidence that Johnson received every raise for which he was eligible and positive yearly performance reviews, and the Finance Department received several awards under his leadership. *See* George Dep., 66:9-14; Johnson Dec., ¶ 18; Fisona Dep., 18:15-16. There is no evidence that Elkton communicated any criticism to Johnson about his performance while he was in Elkton's employ, with the exception of the Mayor's comments about Johnson's clean desk, which Johnson interpreted as a joke. *See* Johnson Dep., 56:2-7. And, the Mayor was not in favor of Johnson's termination. *See* Fisona Dep., 14:1-20. The parties dispute whether any criticism of Johnson was communicated to George. *See* George Dep., 81:2-5. Although Elkton was not required to inform Johnson of perceived deficiencies in his performance, give him an opportunity to rectify those deficiencies, or inform Johnson of the

reasons for his termination, "[t]he fact that an employer has offered inconsistent post-hoc explanations for its employment decisions is probative of pretext…" *Dennis*, *supra,* 290 F.3d at 647; *accord Gay v. Timberlake Homes, Inc.*, RDB-07-1930, 2008 WL 3075588, *10 (D. Md. Aug. 1, 2008). Moreover, although Johnson is not a certified public accountant, this was not a job requirement for the Finance Director. *See* Johnson Dep., at Attachment 5, Job Description for Director of Finance. And, despite Elkton's allegation that Johnson was not competent with computers, when it advertised for a new Finance Director and Assistant Town Administrator after Johnson's departure, it did not include computer literacy as a job requirement. *See id.*; Defendant's Exh. 13, Job Description for Assistant Town Administrator.

With respect to Elkton's reliance on the Commissioners' testimony that Johnson was not terminated because of his age, and that they did not even know his age, the Town overlooks that several deponents stated that they were aware that Johnson was over forty years of age. *See* Givens Dep., 29:16-19; Jablonski Dep., 28:6-10; Piner Dep., 32:2-18. Thus, he was within the ADEA's protected class. And, a reasonable jury could conclude, after viewing the video of the May 9, 2007 meeting, that Johnson was well beyond his forties. Moreover, a reasonable jury, charged with weighing the credibility of the witnesses, could reject the testimony of the decision makers and conclude that they terminated Johnson because of his age. As the Ninth Circuit observed in *EEOC v. Pape Lift, Inc.*, 115 F.3d 676, 684 (9th Cir. 1997), "Few employers who engage in illegal discrimination…express their discriminatory tendencies in such a direct fashion; indeed, we think that even those employers who claim to be ignorant of this nation's long struggle against various forms of employment bias would find a more subtle approach."

Although defendant may believe that it "simply does not make sense that people approximately the same age as [Johnson] would terminate him because of his age," Memo at 44,

the Supreme Court has cautioned: "Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group." *Oncale, supra*, 523 U.S. at 78 ("reject[ing] any conclusive presumption that an employer will not discriminate against members of his own race."); *Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359, 361 (7th Cir. 2001) (applying this principle "with equal force to proof of age discrimination"); *but see Coggins v. Gov't of Dist. of Columbia*, No. 97-2263, 1999 WL 94655, *4 (4th Cir. Feb. 19, 1999) ("The fact that both Krull and Gibbons, first and third in Coggins' chain-of-command, are both Caucasian makes any anti-Caucasian bias unlikely.").

Finally, as to Storke's "young chick" and "young man out of college" comments, I am mindful that the Fourth Circuit has cautioned that "[d]erogatory remarks may in some instances constitute *direct evidence* of discrimination," but "to *prove* discriminatory animus, the derogatory remark cannot be stray or isolated, and unless the remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of discrimination." *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir. 1999) (internal quotation marks and alteration omitted) (emphasis added), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003). Plaintiff does not contend that Commissioner Storke's remarks meet this strict standard. However, plaintiff is not attempting to prove age discrimination by direct evidence. Instead, the comments are of evidentiary value to plaintiff in attempting to prove its case under the *McDonnell Douglas* framework. "Combined with the other circumstantial evidence adduced by Plaintiff, the comments could support an inference of age discrimination." *EEOC v. Enoch Pratt Free Library*, No. RDB-03-2727, 2005 WL 1712393, *10 (D. Md. July 19, 2005). *See also Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 733 (4th Cir.

1996) (holding an age-related remark to be "insufficient to create a genuine issue of fact under the traditional scheme," but observing that "[n]evertheless, evidence of the weakness of [defendant's] nondiscriminatory reasons bolsters [plaintiff's] ambiguous affirmative proof," *i.e.* the age-related remark).

## Conclusion

For the foregoing reasons, the Court will deny the motion for summary judgment of defendant Town of Elkton (ECF 19).   A separate Order follows.


Date: July 13, 2012                                    _____/s/_____
                                                       Ellen Lipton Hollander
                                                       United States District Judge